**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | |
|---|---|
| BOBBY SHELNUT, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDLINK GEORGIA, INC.,<br><br>Defendant. | Case No. 3:26-cv-82<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Bobby Shelnut ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant MedLink Georgia, Inc. ("MedLink" or "Defendant"), and alleges as follows based upon personal knowledge as to his own acts and experiences, and, as to all other matters, upon information and belief, including the investigation of counsel:

## I. NATURE OF THE ACTION

1. This is a class action arising out of a ransomware attack and data breach that compromised the personally identifiable information and protected health information of Plaintiff and thousands of other patients of MedLink Georgia, a federally qualified community health center serving Northeast Georgia (the "Data Breach").

2. MedLink is a nonprofit healthcare provider that operates more than two dozen community health centers across Northeast Georgia and serves tens of thousands of patients each year.[1] To obtain care, patients like Plaintiff were required to entrust MedLink with highly sensitive personal and medical information.

[1] About Us, MedLink Georgia, Inc., https://medlinkga.org/about-us/ (last visited July 7, 2026).

3. On or about June 30, 2026, a ransomware group operating under the name "CMDOrganization" publicly claimed responsibility for a cyberattack on MedLink's systems and asserted that it had exfiltrated data belonging to MedLink and its patients.[2]

4. Upon information and belief, the information maintained by MedLink and placed at risk in the Data Breach includes patients' names, dates of birth, and protected health information, and, for at least some individuals, additional identifiers such as Social Security numbers.

5. As is characteristic of modern ransomware operations, the threat actor employed a "double-extortion" model—both encrypting MedLink's data and exfiltrating it—in order to pressure payment by threatening public release of the stolen information.[3]

6. The Data Breach was a direct and foreseeable result of MedLink's failure to implement and maintain reasonable data-security measures appropriate to the sensitivity of the information it collected and stored, and consistent with well-established standards applicable to healthcare providers.

7. Plaintiff has already experienced concrete misuse of his information: in June 2026, an account that he did not authorize and did not open was opened in his name.

8. As a result of the Data Breach, Plaintiff and members of the proposed Class have suffered injury, including the compromise and misuse of their private information, an imminent and substantial risk of identity theft and fraud, the loss of the benefit of their bargain, the diminution in value of their private information, and the lost time and expense of responding to the breach.

[2] Cmdorganization Strikes Medlink Georgia in Latest Ransomware Attack, DeXpose (June 30, 2026), https://www.dexpose.io/cmdorganization-strikes-medlink-georgia-in-latest-ransomware-attack/ (last visited July 7, 2026).

[3] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

9. Plaintiff brings this action to recover damages and to obtain injunctive and equitable relief requiring MedLink to adopt reasonable security practices adequate to protect the information that remains in its possession.

10. The information MedLink collects from its patients is precisely the kind of information that criminals prize: durable identifiers and health information that cannot be cancelled or reissued and that can be exploited for years after it is stolen. MedLink knew, or should have known, that this information was a target and that its compromise would expose patients to a serious and lasting risk of harm.

11. The measures that would have prevented or mitigated the Data Breach were well established, widely published, and readily available. Federal regulators and recognized standard-setting bodies have for years prescribed the specific safeguards that a healthcare provider holding this information is expected to implement. MedLink's failure to implement one or more of those safeguards was not the product of an unforeseeable or sophisticated threat; it was the product of inadequate security in the face of a well-known risk.

12. Plaintiff seeks to represent a class of all individuals whose private information was compromised in the Data Breach. Plaintiff and the Class were injured by the same conduct—MedLink's failure to secure the information entrusted to it—and they seek the same relief: compensation for the harm they have suffered and an order requiring MedLink to protect the information that remains in its custody.

## II. PARTIES

13. Plaintiff Bobby Shelnut is a natural person and, at all relevant times, a citizen and resident of Bowman, Elbert County, Georgia. Plaintiff is a patient of MedLink and received care at MedLink's Bowman, Georgia location.

14. Defendant MedLink Georgia, Inc. is a Georgia nonprofit corporation with its principal place of business at 11 Charlie Morris Road, Colbert, Georgia 30628. Upon information and belief, MedLink's registered agent is Dave Ward, located at the same address.

15. MedLink is a federally qualified health center that provides primary and preventive healthcare services to communities throughout Northeast Georgia.

## III. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of at least 100 members; and at least one member of the proposed Class is a citizen of a State different from Defendant.

17. This Court has personal jurisdiction over MedLink because MedLink maintains its principal place of business in this District, is at home in Georgia, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because MedLink resides in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. Venue is proper in the Athens Division because MedLink's principal place of business and a substantial part of the operative events are located in counties assigned to this Division.

## IV. FACTUAL ALLEGATIONS

### A. MedLink collects and stores sensitive patient information.

19. MedLink is a nonprofit, federally qualified health center that has provided primary and preventive healthcare services to communities in Northeast Georgia for decades.[4]

20. MedLink offers a broad range of medical services, including primary care, pediatrics, behavioral health, women's health, dental, and pharmacy services, across numerous community health center locations.

21. In the ordinary course of providing these services, MedLink requires its patients, including Plaintiff, to provide sensitive personal and medical information as a condition of receiving care.

22. Upon information and belief, the information MedLink collects and maintains about its patients includes identifying information such as names, addresses, dates of birth, and contact information, together with protected health information concerning diagnoses, treatment, and health insurance, and, for at least some patients, Social Security numbers.

23. Patients entrusted this information to MedLink with the reasonable expectation that MedLink would safeguard it and use it only for legitimate purposes, consistent with MedLink's legal obligations and its own representations.

**B. MedLink represented that it would protect patient information.**

24. MedLink solicited and required its patients to provide sensitive personal and health information as a condition of receiving care, and it did so against a backdrop of representations and obligations—express and implied—that it would keep that information confidential and secure.

25. Upon information and belief, MedLink maintained a privacy policy or notice of privacy practices, as required of healthcare providers, in which it represented that it would protect

[4] About Us, MedLink Georgia, Inc., https://medlinkga.org/about-us/ (last visited July 7, 2026).

the confidentiality of patient information and would use and disclose that information only for permitted purposes.

26. As a federally qualified health center subject to the HIPAA Privacy and Security Rules, MedLink was obligated to furnish patients with a notice of its privacy practices and to safeguard their protected health information. Patients reasonably relied on these representations and obligations in entrusting their information to MedLink.

27. Plaintiff and the Class reasonably understood and expected that, in exchange for their information and their payment for services, MedLink would provide reasonable data security. That expectation was a basic, if implicit, term of their relationship with MedLink.

**C. The Data Breach.**

28. On or about June 30, 2026, a ransomware group operating under the name "CMDOrganization" publicly claimed responsibility for a cyberattack against MedLink and asserted that it had accessed and exfiltrated sensitive data from MedLink's network.[5]

29. Upon information and belief, the threat actor gained unauthorized access to MedLink's information systems and acquired files containing the private information of Plaintiff and members of the proposed Class.[6]

30. Upon information and belief, and consistent with the double-extortion methodology that the CMDOrganization group is reported to employ, the threat actor both encrypted and

[5] Cmdorganization Strikes Medlink Georgia in Latest Ransomware Attack, DeXpose (June 30, 2026), https://www.dexpose.io/cmdorganization-strikes-medlink-georgia-in-latest-ransomware-attack/ (last visited July 7, 2026).

[6] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

exfiltrated MedLink data and threatened to publish the stolen information unless a ransom was paid.[7]

31. Because the exfiltrated information remains in the possession of criminal actors and is subject to sale or disclosure on illicit online marketplaces, the private information of Plaintiff and the Class remains at continuing risk of misuse.

**D. MedLink's data-security obligations.**

32. As a healthcare provider entrusted with protected health information, MedLink was subject to well-established legal and industry obligations to safeguard the information in its custody.

33. The Health Insurance Portability and Accountability Act ("HIPAA") and its implementing Security Rule establish a recognized standard of care for the protection of electronic protected health information, requiring covered entities to implement administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of such information. See 45 C.F.R. §§ 164.302–164.318. *HIPAA is pleaded here solely as a reference for the applicable standard of care and not as an independent cause of action or as a basis for negligence per se.*

34. The U.S. Department of Health and Human Services has long published guidance confirming that reasonable cybersecurity safeguards are a settled expectation for healthcare organizations, not a novel obligation.[8]

35. Federal guidance specific to the healthcare sector identifies foundational safeguards that providers are expected to implement, including email protection, endpoint protection, access

[7] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

[8] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

management, data protection, vulnerability management, and incident-response planning.[9] The Department has further identified sector cybersecurity performance goals prioritizing multifactor authentication, encryption, credential management, and incident planning.[10]

36. Beyond the healthcare sector, the Federal Trade Commission has repeatedly instructed businesses that reasonable data security requires inventorying stored personal information, securely disposing of data that is no longer needed, encrypting sensitive information, understanding system vulnerabilities, and planning for breaches.[11] The FTC has likewise emphasized building security into operations from the outset, including access controls, strong authentication, network segmentation and monitoring, and timely patching.[12]

37. Widely recognized technical frameworks define the baseline of reasonable security. The National Institute of Standards and Technology publishes a comprehensive catalog of security and privacy controls addressing access control, authentication, audit and logging, incident response, and risk assessment.[13] The Center for Internet Security publishes a prioritized set of Critical Security Controls that represents industry consensus on reasonable security practices.[14]

---

[9] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited July 7, 2026).

[10] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).

[11] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 7, 2026).

[12] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited July 7, 2026).

[13] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited July 7, 2026).

[14] Ctr. for Internet Sec., CIS Critical Security Controls (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1 (last visited July 7, 2026).

38. MedLink failed to implement one or more of these basic, well-established safeguards, and that failure permitted the threat actor to access and exfiltrate the private information of Plaintiff and the Class.

**E. Reasonable security required specific, well-defined safeguards that MedLink failed to implement.**

39. The measures that constitute reasonable data security for an organization holding sensitive personal and health information are not vague aspirations; they are specific, cataloged, and freely published. The National Institute of Standards and Technology maintains a comprehensive control catalog addressing, among other families, access control, identification and authentication, audit and accountability, incident response, risk assessment, and system and information integrity.[15]

40. The Center for Internet Security publishes a prioritized set of Critical Security Controls—including inventory and control of assets, continuous vulnerability management, controlled use of administrative privileges, maintenance and monitoring of audit logs, malware defenses, boundary defense, and data protection—that represents industry consensus on the safeguards a reasonable organization must implement.[16]

41. For healthcare organizations specifically, the Department of Health and Human Services, through its 405(d) program, identified a set of practical safeguards keyed to the sector's most significant threats, including email protection, endpoint protection, access management, data protection and loss prevention, and vulnerability management.[17] The Department separately

[15] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited July 7, 2026).

[16] Ctr. for Internet Sec., CIS Critical Security Controls (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1 (last visited July 7, 2026).

[17] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited July 7, 2026).

articulated sector cybersecurity performance goals emphasizing multifactor authentication, encryption, credential management, and incident planning as foundational.[18]

42. The Federal Trade Commission has distilled comparable expectations from decades of enforcement, instructing businesses to build security into their operations from the start, to control access to data, to require secure authentication, to segment and monitor networks, to apply sound security practices when developing and maintaining systems, and to keep security current through patching and monitoring.[19] These expectations reflect a settled regulatory understanding of reasonable security, not a novel or shifting standard.[20]

43. Upon information and belief, MedLink failed to implement one or more of these well-established safeguards—including, among others, adequate access controls and authentication, network monitoring and intrusion detection, timely patching and vulnerability management, encryption of sensitive data at rest, and workforce training—and that failure was a direct and proximate cause of the Data Breach.

**F. The HIPAA Security Rule reflects the applicable standard of care.**

44. As a healthcare provider, MedLink was subject to the HIPAA Security Rule, which establishes a nationally recognized framework for safeguarding electronic protected health information. Plaintiff references the Security Rule solely as evidence of the applicable standard of care—not as an independent cause of action and not as a basis for negligence per se.

45. The Security Rule requires covered entities to ensure the confidentiality, integrity, and availability of the electronic protected health information they create, receive, maintain, or

---

[18]U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).
[19]Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited July 7, 2026).
[20]Fed. Trade Comm'n, Data Security (resource page), https://www.ftc.gov/business-guidance/privacy-security/data-security (last visited July 7, 2026).

transmit; to protect against reasonably anticipated threats or hazards to the security of that information; to protect against reasonably anticipated impermissible uses or disclosures; and to ensure workforce compliance. See 45 C.F.R. § 164.306(a).

46. The Security Rule further requires covered entities to implement administrative, physical, and technical safeguards, including access controls that limit information-system access to authorized persons and software, audit controls, integrity controls, and transmission security. See 45 C.F.R. §§ 164.308, 164.310, 164.312.

47. The Department of Health and Human Services has long published guidance elaborating on these obligations and confirming that basic safeguards and cyber-preparedness are longstanding expectations for entities holding protected health information.[21]

48. MedLink's failure to prevent the unauthorized access to and exfiltration of protected health information is evidence that MedLink did not meet the standard of care that the Security Rule reflects.

### G. The Data Breach was foreseeable and preventable.

49. The risk that healthcare providers would be targeted by ransomware and data-exfiltration attacks was well known long before June 2026. Federal authorities have repeatedly warned that ransomware is a pervasive and evolving threat and have published detailed, freely available guidance on how to prevent and mitigate it.[22]

[21] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

[22] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

50. The exploitation of known, unpatched vulnerabilities is a leading vector for such attacks, and timely vulnerability management is a baseline cybersecurity function that federal authorities have long urged organizations to perform.[23]

51. Data breaches affecting the healthcare sector have become routine and are among the most common categories of reported data compromises, a trend documented in annual reporting on breach volume.[24]

52. Federal healthcare regulators have specifically recognized that ransomware presents a foreseeable threat to protected health information and that a ransomware incident triggers a covered entity's breach-analysis obligations.[25]

53. Given the sensitivity and volume of the information MedLink collected, and the well-publicized wave of ransomware attacks against healthcare providers, the Data Breach was a foreseeable consequence of MedLink's failure to maintain reasonable security. Had MedLink implemented the safeguards described above, the Data Breach could have been prevented or its impact materially limited.

### H. Ransomware and data-exfiltration attacks on healthcare providers were a known and escalating threat.

54. For years preceding the Data Breach, federal cybersecurity authorities repeatedly and publicly warned that healthcare providers were among the most heavily targeted victims of ransomware and data-theft campaigns. The Cybersecurity and Infrastructure Security Agency,

---

[23] Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (continuously updated) (last visited July 7, 2026).

[24] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

[25] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Fact Sheet: Ransomware and HIPAA (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited July 7, 2026).

together with partner agencies, has published and repeatedly updated detailed guidance identifying ransomware as a pervasive threat and prescribing specific, freely available defensive controls.[26]

55. These warnings were not abstract. Federal healthcare regulators specifically advised covered entities that ransomware attacks against protected health information were foreseeable, that such attacks trigger breach-analysis obligations, and that entities must prepare contingency and response plans in advance.[27]

56. The threat was compounded by the evolution of ransomware into a "double-extortion" model, in which attackers not only encrypt a victim's systems but also exfiltrate sensitive data and threaten to publish it. This model—which, upon information and belief, the CMDOrganization group employed here—was widely documented and well known before June 2026, and it made the theft and public exposure of patient data a foreseeable consequence of any successful intrusion.[28]

57. The scale of healthcare-sector breaches underscored the risk. Annual reporting on data-compromise volume has repeatedly identified healthcare as one of the most-affected sectors, with the number of reported compromises and affected individuals reaching record levels in recent years.[29]

---

[26] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

[27] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Fact Sheet: Ransomware and HIPAA (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited July 7, 2026).

[28] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

[29] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

58. Numerous large, well-publicized ransomware and data-theft incidents affecting healthcare organizations preceded the Data Breach and placed the entire sector—including MedLink—on notice that providers holding protected health information were prime targets and that reasonable, current safeguards were essential.[30]

59. MedLink, as a federally qualified health center receiving federal funding and subject to federal health-privacy obligations, knew or should have known of these warnings and of the acute risk to the sensitive information in its custody. The foreseeability of exactly this kind of attack heightened MedLink's duty to implement robust, current safeguards.[31]

60. The methods by which ransomware groups gain access to victim networks are well documented and defensible against. Attackers routinely exploit known, publicly cataloged software vulnerabilities for which patches are available, compromise credentials through phishing, and move laterally through networks that lack segmentation and monitoring. Federal authorities maintain and continuously update a public catalog of known exploited vulnerabilities precisely so that organizations can prioritize remediation and close these avenues of attack.[32]

61. Because these attack methods are known and the corresponding defenses are established, a successful ransomware intrusion and data exfiltration of the kind alleged here ordinarily reflects a failure to implement one or more baseline safeguards—such as timely

[30] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

[31] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).

[32] Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (continuously updated) (last visited July 7, 2026).

patching, multifactor authentication, network segmentation, and continuous monitoring—rather than an unforeseeable or irresistible threat.[33]

62. Federal incident-response guidance further recognizes that organizations must prepare for security incidents in advance and integrate incident response into their overall risk-management program, so that when an incident occurs the organization can rapidly detect, contain, and remediate it and limit the harm to affected individuals.[34]

63. MedLink's failure to prevent, detect, and contain the Data Breach, and the resulting exfiltration of the private information of Plaintiff and the Class, reflects a departure from these well-established expectations.

**I. MedLink's response obligations.**

64. Upon discovering a cyberattack, a healthcare entity is expected to promptly identify and respond to the incident, mitigate harm, and provide affected individuals with timely and accurate notice of the nature and scope of the compromise.[35] Established incident-response guidance requires organizations to integrate incident handling into their broader risk-management program to reduce impact and speed detection, response, and recovery.[36]

---

[33] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

[34] Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited July 7, 2026).

[35] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, My Entity Just Experienced a Cyber-Attack! What Do We Do Now? A Quick-Response Checklist (June 2017), https://www.hhs.gov/sites/default/files/cyber-attack-checklist-06-2017.pdf (last visited July 7, 2026).

[36] Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited July 7, 2026).

65. The FTC's data-breach-response guidance similarly directs organizations to secure their systems, remediate vulnerabilities, preserve evidence, and provide required notifications without delay.[37]

66. Timely and accurate notice is essential because it enables affected individuals to take protective measures—such as monitoring accounts, placing fraud alerts and credit freezes, and scrutinizing medical and insurance records—before their information is misused.

67. Georgia law reflects this expectation. Georgia's data-breach notification statute requires an information broker or data collector that maintains computerized personal information to give notice of a breach of the security of the system following discovery, in the most expedient time possible and without unreasonable delay. See O.C.G.A. §§ 10-1-910 to -912.

68. Independent of any statute, the HIPAA Breach Notification Rule requires covered entities to notify affected individuals of a breach of unsecured protected health information without unreasonable delay and in no case later than sixty days following discovery. See 45 C.F.R. §§ 164.400–414. This rule is referenced as a further benchmark for the notice MedLink owed, not as an independent cause of action.

69. Prompt, complete notice was particularly important here because the sensitivity of the compromised information means that early detection and mitigation can materially reduce the risk of downstream identity theft and medical identity theft. Any delay or incompleteness in MedLink's notice compounded the harm to Plaintiff and the Class by depriving them of the opportunity to protect themselves at the earliest possible moment.

### J. The value of the compromised information and the resulting risk of harm.

[37] Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited July 7, 2026).

70. The private information compromised in the Data Breach is valuable to criminals precisely because it can be used to commit identity theft, financial fraud, and medical identity theft, and because—unlike a payment-card number—core identifiers such as Social Security numbers, dates of birth, and medical histories cannot readily be changed or cancelled.

71. The Social Security Administration has explained that a compromised Social Security number can be used to commit tax fraud, benefits fraud, employment fraud, and financial fraud, and that the harms may recur over time.[38]

72. The misuse of stolen information is frequently delayed. The U.S. Government Accountability Office has found that stolen data may remain dormant for a year or more before it is used, and that fraudulent use can continue for years thereafter, such that the full extent of harm from a breach often cannot be measured immediately.[39] Federal consumer-protection authorities have likewise cautioned that the absence of immediate confirmed fraud does not negate the present risk that stolen information will be misused.[40]

73. Because of the sensitivity of the information involved, Plaintiff and members of the Class face a present, imminent, and substantial risk of identity theft and fraud, and must devote time and resources to monitoring their financial, medical, and insurance records to detect and mitigate misuse.

**K. Protected health information is uniquely valuable and uniquely dangerous when stolen.**

[38] Soc. Sec. Admin., Identity Theft and Your Social Security Number, SSA Pub. No. 05-10064 (2018).

[39] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

[40] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited July 7, 2026).

74. Protected health information is among the most valuable categories of data to criminals because it is rich, durable, and difficult to remediate. A single medical record may combine identifying information, insurance details, and clinical history—information that cannot be cancelled or reissued the way a payment card can.

75. Unlike a compromised payment-card number, which a consumer can cancel to cut off the risk of further misuse, core identifiers such as Social Security numbers, dates of birth, and medical histories are effectively immutable. Once stolen, they can be exploited for years, and the harm compounds over time.[41]

76. Stolen health information enables medical identity theft, in which a criminal uses another person's identity or insurance to obtain treatment, prescriptions, or services—corrupting the victim's medical and insurance records and creating risks to both finances and health that can be extraordinarily difficult to unwind.

77. The misuse of stolen data is frequently delayed, which makes the risk more dangerous, not less. The Government Accountability Office has found that stolen information may lie dormant for a year or more before it is used and that resulting harm can continue for years thereafter, such that the full extent of harm from a breach often cannot be measured at the outset.[42] Federal consumer-protection authorities have similarly cautioned that the absence of immediate confirmed misuse does not negate present risk.[43]

[41] Soc. Sec. Admin., Identity Theft and Your Social Security Number, SSA Pub. No. 05-10064 (2018).

[42] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

[43] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited July 7, 2026).

78. Because the information compromised in the Data Breach includes durable, sensitive identifiers and health information, Plaintiff and the Class face a present and continuing risk of identity theft, financial fraud, and medical identity theft that will persist for years and that requires ongoing vigilance to detect and mitigate.

**L. Plaintiff and the Class must expend time and resources to mitigate the risk of harm.**

79. When sensitive information is compromised, a reasonable person must take protective steps to guard against identity theft and fraud. Federal authorities recommend that breach victims review account statements and credit reports, place fraud alerts or credit freezes, monitor for unauthorized activity, and, for health information, scrutinize medical and insurance records for signs of misuse.[44]

80. These steps take time and, in many cases, money. The Government Accountability Office has recognized that victims of identity theft can face substantial costs and lost time to repair the damage to their credit and their records.[45]

81. Plaintiff and the Class have already been required, and will continue to be required, to devote time and resources to these protective measures as a direct and proximate result of the Data Breach—time and resources they would not otherwise have had to spend.

**M. Plaintiff and the Class lost the benefit of their bargain and the value of their information.**

82. A portion of the value that Plaintiff and the Class conferred on MedLink—whether through direct payment, insurance, or public funding tied to their care—was reasonably understood

[44] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

[45] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

to fund the reasonable data security that a healthcare provider is expected to maintain. MedLink did not deliver that security.

83. Plaintiff and the Class therefore did not receive the full benefit of their bargain. Had they known that MedLink would not maintain reasonable safeguards for their sensitive information, they would have paid less for MedLink's services, taken additional protective measures, or declined to provide certain information.

84. Separately, personal and health information has recognized economic value, and a market exists in which such information is bought and sold, both lawfully and unlawfully. The compromise of that information in the Data Breach diminished its value to Plaintiff and the Class by stripping it of its confidentiality and exposing it to unauthorized use.

85. The transfer and exposure of this information occurred without any compensation to Plaintiff or the Class, and the resulting loss of confidentiality and control constitutes a concrete economic injury independent of any subsequent fraud.[46]

**N. The private information of Plaintiff and the Class remains at risk.**

86. Upon information and belief, MedLink continues to maintain the private information of Plaintiff and the Class in its systems, and, upon information and belief, continues to employ data-security measures that are inadequate to protect that information against foreseeable threats.

87. The continuing risk is heightened because the same categories of information that were compromised remain in MedLink's custody and, upon information and belief, MedLink has

[46] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

not demonstrated that it has remediated the vulnerabilities that permitted the Data Breach or adopted the safeguards necessary to prevent a recurrence.[47]

88. Injunctive and equitable relief is therefore necessary and appropriate. Federal guidance identifies the specific measures that a healthcare organization is expected to maintain—including multifactor authentication, encryption, access and credential management, vulnerability management, monitoring, and incident-response planning—and MedLink should be required to implement and maintain such measures to protect the information that remains in its possession.[48]

89. So long as MedLink retains this information without adopting reasonable safeguards, Plaintiff and the Class face a continuing risk of further unauthorized access and disclosure. Injunctive and equitable relief is necessary to address that ongoing risk.[49]

90. The information already exfiltrated in the Data Breach remains in the hands of criminal actors and, upon information and belief, is subject to sale, trade, or disclosure on illicit marketplaces, extending the risk of misuse well into the future.[50]

## V. PLAINTIFF-SPECIFIC ALLEGATIONS

91. Plaintiff Bobby Shelnut is a patient of MedLink and received care at MedLink's Bowman, Georgia location. As a condition of receiving care, Plaintiff provided MedLink with his sensitive personal and medical information.

---

[47] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited July 7, 2026).

[48] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).

[49] Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited July 7, 2026).

[50] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

92. Plaintiff reasonably expected and understood that MedLink would maintain his information securely and would use it only for legitimate healthcare purposes. Plaintiff would not have provided his information, or would have taken additional protective measures, had he known that MedLink's data-security practices were inadequate.

93. At the time of the Data Breach, MedLink maintained Plaintiff's private information in its systems.

94. In or about June 2026, an account that Plaintiff did not authorize and did not open was opened in his name. Plaintiff retained documentation reflecting the unauthorized account.

95. Since the Data Breach, Plaintiff has also experienced an increase in unsolicited spam telephone calls and emails, consistent with the exposure and dissemination of his contact information.

96. Plaintiff has expended time responding to the Data Breach and to the unauthorized account opened in his name, and remains at heightened risk of further identity theft and fraud.

97. As a direct and proximate result of the Data Breach, Plaintiff has suffered concrete and particularized injury, including: (i) the actual misuse of his identity through the opening of an unauthorized account in his name; (ii) the compromise, theft, and unauthorized exposure of his private information; (iii) a present, imminent, and substantial risk of further identity theft and fraud; (iv) the loss of time and effort reasonably incurred in responding to the Data Breach and the unauthorized account; (v) the diminution in value of his private information; (vi) the loss of the benefit of the bargain; and (vii) the continued risk to his information that remains in MedLink's possession.

## VI. <u>INJURIES COMMON TO THE CLASS</u>

98. The Data Breach exposed Plaintiff and every member of the Class to the same categories of injury arising from the same course of conduct: MedLink's failure to secure the private information entrusted to it.

99. Plaintiff and the Class have suffered, and will continue to suffer, injury including: (i) the compromise, theft, and unauthorized exposure of their private information; (ii) a present, imminent, and substantial risk of identity theft and fraud; (iii) the loss of time and out-of-pocket costs reasonably incurred in monitoring accounts and records and otherwise responding to the Data Breach; (iv) the diminution in value of their private information; (v) the loss of the benefit of the bargain; and (vi) the continued risk to information that remains in MedLink's possession so long as MedLink fails to adopt adequate safeguards.

100. These injuries flow directly from MedLink's common course of conduct and are common to Plaintiff and every member of the Class.

101. The risk of future harm to Plaintiff and the Class is neither speculative nor remote. The information compromised in the Data Breach is precisely the information that criminals use to commit identity theft and fraud, and it was taken by a criminal threat actor that, upon information and belief, exfiltrated it for the purpose of exploitation or sale. The risk of misuse is therefore imminent and substantial.[51]

102. The harm from the Data Breach will not necessarily manifest immediately. Stolen personal and health information may be held and trafficked for months or years before it is used, and a single set of stolen identifiers can be used repeatedly and in combination with other data to

[51] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

perpetrate multiple frauds over time. As a result, Plaintiff and the Class must remain vigilant—and bear the associated costs—for the foreseeable future.[52]

103. The reasonable and necessary response to this risk includes monitoring financial accounts and credit reports, placing and lifting fraud alerts and security freezes, reviewing medical and insurance records for evidence of medical identity theft, and purchasing credit-monitoring and identity-protection services. These measures impose real and ongoing costs of time and money on Plaintiff and the Class.[53]

## VII. CLASS ACTION ALLEGATIONS

104. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of the following proposed Class:

> All individuals residing in the United States whose private information was accessed, acquired, or compromised as a result of the Data Breach that is the subject of this Complaint (the "Class").

105. Excluded from the Class are: MedLink and its officers, directors, and affiliates; any entity in which MedLink has a controlling interest; the judge presiding over this action and his or her immediate family and staff; and any person who timely and properly excludes himself or herself from the Class.

106. Plaintiff reserves the right to modify or amend the Class definition, including to add one or more subclasses, as discovery proceeds and the scope of the Data Breach is confirmed.

---

[52] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited July 7, 2026).

[53] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

107. Numerosity (Rule 23(a)(1)). The Class consists of at least thousands of individuals whose information MedLink maintained, making joinder of all members impracticable. Class members are identifiable from MedLink's own records.

108. Commonality (Rule 23(a)(2)). Common questions of law and fact exist as to all Class members and predominate over individualized questions, including, without limitation, the following:

a. whether MedLink collected and maintained the private information of Plaintiff and the Class;

b. whether MedLink owed a duty to Plaintiff and the Class to implement and maintain reasonable measures to safeguard their private information;

c. whether MedLink implemented and maintained reasonable data-security measures;

d. whether MedLink's data-security practices met the standard of care reflected in HIPAA, in guidance from HHS and the FTC, and in recognized frameworks published by NIST and CIS;

e. whether MedLink knew or should have known that its data-security measures were inadequate and that a breach was foreseeable;

f. whether MedLink's conduct caused or permitted the Data Breach;

g. whether MedLink entered into implied contracts with Plaintiff and the Class to safeguard their private information and, if so, whether MedLink breached those contracts;

h. whether MedLink was unjustly enriched by failing to provide the data security for which Plaintiff and the Class paid;

i. whether MedLink provided timely and adequate notice of the Data Breach;

j. whether Plaintiff and the Class suffered injury as a result of the Data Breach and are entitled to damages;

k. whether Plaintiff and the Class are entitled to injunctive and other equitable relief, including a declaration of MedLink's ongoing duties; and

l. the appropriate scope and terms of any injunctive relief necessary to protect the information that remains in MedLink's possession.

109. Typicality (Rule 23(a)(3)). Plaintiff's claims are typical of the claims of the Class because Plaintiff and every Class member were subjected to the same conduct, had the same categories of information compromised in the same Data Breach, and were injured in the same manner.

110. Adequacy (Rule 23(a)(4)). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in complex class-action and data-breach litigation.

111. Predominance and Superiority (Rule 23(b)(3)). Common questions predominate over individualized ones, and a class action is superior to other methods for the fair and efficient adjudication of this controversy. The cost of litigating individual claims would exceed any individual recovery, and class treatment avoids the risk of inconsistent adjudications.

112. Injunctive Relief (Rule 23(b)(2)). MedLink has acted or refused to act on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate for the Class as a whole.

113. Issue Certification (Rule 23(c)(4)). In the alternative, particular common issues—including the existence and breach of MedLink's duty and the adequacy of its security and notice—are appropriate for issue certification.

## VIII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
***(On Behalf of Plaintiff and the Class)***

114. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

115. MedLink required Plaintiff and the Class to provide their private information as a condition of receiving healthcare services, and MedLink collected, maintained, and controlled that information.

116. By collecting and storing this sensitive information, MedLink assumed a duty to exercise reasonable care to secure and safeguard it, to prevent its unauthorized access and disclosure, and to implement processes to detect and respond to a breach and to provide prompt and accurate notice.

117. MedLink's duty to use reasonable care arose from the special relationship between a healthcare provider and its patients, from MedLink's voluntary undertaking to collect and safeguard the information, and from its position as the party in control of the information and best able to protect it against foreseeable criminal conduct.

118. The applicable standard of care is informed by well-established authorities, including the HIPAA Security Rule, which sets a recognized benchmark for safeguarding protected health information (referenced here solely as a standard-of-care benchmark and not as an independent cause of action), as well as guidance and frameworks published by the Department of Health and Human Services, the Federal Trade Commission, the National Institute of Standards

and Technology, the Cybersecurity and Infrastructure Security Agency, and the Center for Internet Security.[54]

119. MedLink breached its duty of care by failing to implement and maintain reasonable security measures adequate to protect the private information in its custody, including, upon information and belief, by failing to adequately safeguard its systems against known threats, to monitor and detect unauthorized access, to timely remediate known vulnerabilities, and to maintain appropriate access controls and authentication.

120. It was reasonably foreseeable that MedLink's failure to maintain reasonable security would result in the unauthorized access to and exfiltration of Plaintiff's and the Class's private information and the resulting harm, particularly given the well-documented frequency of ransomware attacks against healthcare providers.[55]

121. But for MedLink's failure to exercise reasonable care, the private information of Plaintiff and the Class would not have been accessed, acquired, and exposed. MedLink's breach of its duty was the direct and proximate cause of the injuries suffered by Plaintiff and the Class.

122. As a direct and proximate result of MedLink's negligence, Plaintiff and the Class have suffered and will suffer injury as described above, including the actual misuse of Plaintiff's identity, the compromise of their private information, the imminent risk of identity theft and fraud, lost time and out-of-pocket costs, the diminution in value of their private information, and the loss of the benefit of the bargain.

---

[54] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

[55] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

123. Plaintiff and the Class are entitled to compensatory and consequential damages, and to injunctive and equitable relief requiring MedLink to adopt and maintain reasonable security measures and to provide adequate credit and identity monitoring.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Class)***

124. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

125. Plaintiff and the Class provided their private information to MedLink as part of obtaining healthcare services from MedLink. In exchange, MedLink received the information and payment for its services, whether from Plaintiff and the Class directly or on their behalf.

126. Implicit in the parties' relationship was MedLink's agreement to safeguard the private information it required Plaintiff and the Class to provide, to use that information only for authorized purposes, and to provide timely and accurate notice in the event of a breach.

127. The mutual understanding and intent that MedLink would protect this information is demonstrated by the parties' conduct, by the sensitive and confidential nature of the information exchanged, and by MedLink's obligations as a healthcare provider.

128. Plaintiff and the Class would not have entrusted their private information to MedLink absent MedLink's implied agreement to safeguard it.

129. Plaintiff and the Class performed their obligations under the implied contract by providing their information and paying for MedLink's services.

130. MedLink breached the implied contract by failing to implement reasonable data-security measures, by failing to safeguard the private information, and by failing to provide timely and adequate notice of the Data Breach.

131. As a direct and proximate result of MedLink's breach, Plaintiff and the Class did not receive the full benefit of their bargain and instead received healthcare services of diminished value, and they suffered the injuries described above.

132. Plaintiff and the Class are entitled to compensatory, consequential, and nominal damages, and to appropriate injunctive and equitable relief.

**COUNT III**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Class, in the Alternative)***

133. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein. Plaintiff brings this Count in the alternative to the breach-of-implied-contract claim.

134. Plaintiff and the Class conferred a benefit on MedLink by providing payment for services and by entrusting MedLink with their valuable private information.

135. MedLink appreciated and retained that benefit. A portion of the value MedLink received was reasonably understood to be dedicated to providing adequate data security for the information entrusted to it.

136. MedLink failed to provide the reasonable data security for which Plaintiff and the Class paid, and instead retained the benefit of the reduced costs realized by not implementing adequate safeguards.

137. Under these circumstances, it would be inequitable and unjust for MedLink to retain the benefit it received without providing the data security that formed part of the consideration for the parties' exchange.

138. Plaintiff and the Class are entitled to restitution, disgorgement, or the imposition of a constructive trust in the amount by which MedLink was unjustly enriched.

**COUNT IV**
**DECLARATORY JUDGMENT**
***(On Behalf of Plaintiff and the Class)***

139. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

140. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief.

141. An actual controversy exists between Plaintiff and the Class, on the one hand, and MedLink, on the other, concerning whether MedLink owes ongoing duties to safeguard the private information that remains in its possession, whether MedLink's existing data-security measures are reasonable and adequate, and whether Plaintiff and the Class remain at risk of further harm.

142. MedLink continues to maintain the private information of Plaintiff and the Class, and, upon information and belief, continues to employ data-security measures that are inadequate to protect that information against foreseeable threats.

143. Plaintiff therefore seeks a declaration that (a) MedLink owes a duty to Plaintiff and the Class to implement and maintain reasonable data-security measures; (b) MedLink's existing measures are inadequate; and (c) reasonable data-security measures, as specified in the Prayer for Relief, must be implemented and maintained.

144. A declaratory judgment is necessary and appropriate so that Plaintiff and the Class may ascertain their rights and so that MedLink's continuing duties may be established and enforced.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment against MedLink and grant the following relief:

A. An order certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A declaration that MedLink owes ongoing duties to safeguard the private information of Plaintiff and the Class and that its existing data-security measures are inadequate;

C. Injunctive and equitable relief requiring MedLink to implement and maintain reasonable data-security measures, including, without limitation:

i. engaging independent third-party security auditors and internal personnel to conduct testing, including simulated attacks and penetration tests, on MedLink's systems on a periodic basis;

ii. auditing, testing, and training MedLink's security personnel regarding any new or modified procedures;

iii. encrypting private information maintained by MedLink and implementing appropriate access controls, including multifactor authentication;

iv. segmenting data and implementing appropriate network monitoring, logging, and intrusion detection;

v. implementing a comprehensive information-security program with regular vulnerability scanning, timely patching, and threat management;

vi. conducting regular database scanning and security checks;

vii. routinely conducting internal training and education for employees on how to identify, contain, and respond to data-security threats;

viii. purging, deleting, and destroying private information no longer necessary for MedLink's provision of services, in a reasonable manner;

ix. meaningfully educating Class members about the threats they face as a result of the Data Breach and the measures they can take to protect themselves;

x. implementing logging and monitoring sufficient to detect and track anomalous access to systems containing private information;

xi. engaging an independent third party to conduct periodic assessments of MedLink's information-security program and to report the results to the Court and to Class Counsel for an appropriate period; and

xii. providing Class members with adequate credit monitoring and identity-theft protection, and the means to obtain reimbursement for losses fairly traceable to the Data Breach;

D. An award of damages, including actual, compensatory, consequential, and nominal damages, in an amount to be determined at trial;

E. An award of restitution and disgorgement as pleaded in the alternative;

F. An award of credit monitoring and identity-theft protection, and the costs of such monitoring, for an appropriate period;

G. An award of pre- and post-judgment interest as allowed by law;

H. An award of reasonable attorneys' fees, costs, and litigation expenses as allowed by law; and

I. Such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: July 8, 2026

Respectfully submitted,

*/s/ Scott C. Harris*
Scott C. Harris (GA Bar No.: 101830)
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
900 W. Morgan St. Raleigh, NC 27603
Tel: 919-600-5003
Fax: 919-600-5035
sharris@brysonpllc.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

**Application for admission pro hac vice forthcoming.*

*Counsel for Plaintiff and the Class*